**RANSOM, GILBERTSON, MARTIN
& RATLIFF, L.L.P.**
Jeffrey Ratliff
1500 NE Irving Street, Suite 412
Portland, Oregon 97232
Tel: 503-226-3664
OSB No.: 893422

Counsel for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. _____ ) ) JURY TRIAL DEMANDED |
| CASCADE BANCORP, JEROL E. ANDRES, CHRIS C. CASCIATO, MICHAEL J. CONNOLLY, ANNETTE G. ELG, DENNIS L. JOHNSON, J. LAMONT KEEN, JAMES B. LOCKHART III, PATRICIA L. MOSS, RYAN R. PATRICK, THOMAS M. WELLS, TERRY E. ZINK, and FIRST INTERSTATE BANCSYSTEM, INC., | ) ) CLASS ACTION COMPLAINT FOR ) VIOLATION OF THE SECURITIES ) EXCHANGE ACT OF 1934 ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action stems from a proposed transaction announced on November 17, 2016 (the "Proposed Transaction"), pursuant to which Cascade Bancorp ("Cascade" or the

"Company") will be acquired by First Interstate BancSystem, Inc. ("First Interstate").

2.      On November 17, 2016, Cascade's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with First Interstate.  Pursuant to the terms of the Merger Agreement, shareholders of Cascade will receive 0.14864 shares of First Interstate's Class A common stock and $1.91 in cash.

3.      On January 26, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Cascade common stock.

9.      Defendant Cascade is an Oregon corporation and maintains its principal executive office at 1100 NW Wall Street, Bend, Oregon 97703.  Cascade's common stock is traded on the Nasdaq CM under the ticker symbol "CACB."

10.      Defendant Jerol E. Andres ("Andres") has served as a director of Cascade since 1993.  According to the Form DEF 14A filed with the SEC on April 13, 2016 (the "2016 DEF 14A"), Andres is Chair of the Compensation Committee and a member of the Audit and Enterprise Risk Management Committee.

11.      Defendant Chris C. Casciato ("Casciato") has served as a director of Cascade since 2011.  According to the 2016 DEF 14A, Casciato is a member of the Compensation Committee.

12.      Defendant Michael J. Connolly ("Connolly") has served as a director of Cascade since 2011.  According to the 2016 DEF 14A, Connolly is a member of the Compensation Committee and the Audit and Enterprise Risk Management Committee.

13.      Defendant Annette G. Elg ("Elg") has served as a director of Cascade since 2014. According to the 2016 DEF 14A, Elg is a member of the Audit and Enterprise Risk Management Committee and the Nominating and Corporate Governance Committee.

14.      Defendant Dennis L. Johnson ("Johnson") has served as a director of Cascade since 2014.   According to the 2016 DEF 14A, Johnson is a member of the Compensation Committee.

15.      Defendant J. LaMont Keen ("Keen") has served as a director of Cascade since

2012.  According to the 2016 DEF 14A, Keen is Chair of the Audit and Enterprise Risk Management Committee and a member of the Nominating and Corporate Governance Committee.

16.    Defendant James B. Lockhart III ("Lockhart") has served as a director of Cascade since 2011.  According to the 2016 DEF 14A, Lockhart is a member of the Nominating and Corporate Governance Committee.

17.    Defendant Patricia L. Moss ("Moss") has served as a director of Cascade since 1993.

18.    Defendant Ryan R. Patrick ("Patrick") has served as a director of Cascade since 1998 and is Chairman of the Board.  According to the 2016 DEF 14A, Patrick is a member of the Audit and Enterprise Risk Management Committee and the Nominating and Corporate Governance Committee.

19.    Defendant Thomas M. Wells ("Wells") has served as a director of Cascade since 2006.  According to the 2016 DEF 14A, Wells is Chair of the Nominating and Corporate Governance Committee.

20.    Defendant Terry E. Zink ("Zink") has served as a director, President, and Chief Executive Officer ("CEO") of Cascade since 2012.

21.    The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Individual Defendants."

22.    Defendant First Interstate is a Montana corporation, a party to the Merger Agreement, and maintains its principal executive office at 401 North 31st Street, Billings, Montana 59116.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Cascade (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.    This action is properly maintainable as a class action.

25.    The Class is so numerous that joinder of all members is impracticable.  As of January 26, 2017, there were approximately 79.5 million shares of Cascade common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.    Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company and the Proposed Transaction***

30.    Cascade is a bank holding company headquartered in Bend, Oregon.

31.    The Company conducts its operations primarily through its wholly owned subsidiary, Bank of the Cascades ("Cascade Bank"), an Oregon-chartered bank originally founded in 1977.

32.    Cascade Bank provides full-service community banking through its 50 banking offices in Oregon, Idaho, and Washington.

33.    On July 27, 2016, Cascade issued a press release wherein it reported its financial results for the second quarter ended June 30, 2016.

34.    Net income for the second quarter of 2016 was $4.8 million, or $0.07 per share, compared to $1.9 million, or $0.03 per share, for the first quarter of 2016.  Non-interest income was $7.8 million, up $2.3 million, or 42.4%, compared to the first quarter of 2016.  At June 30, 2016, gross loans were $1.9 billion compared to $1.8 billion as of March 31, 2016.  Second quarter organic loan growth was $75.0 million, or 20.6% annualized.

35.    With respect to the financial results, Individual Defendant Zink, President and CEO of the Company, commented:

> I am very pleased with the quarter's progress towards our goal of building a valuable banking franchise in the attractive growth markets of the Pacific Northwest[.] We retained 97.8% of the deposits we assumed in the purchase of the former Bank of America branches in March, demonstrating the strength of Cascade's high touch community banking model.  We are now focused on driving fee income as well as deploying the acquired deposits into higher yielding loans

6

through the balance of the year.  The early results are positive with strong increases in both non-interest income and loan growth.

Also during the quarter, we announced the acquisition of Prime Pacific Bank, N.A., located in the Greater Seattle market.  We believe that Prime Pacific will complement our newly opened downtown Seattle commercial banking center, as well as expand our venture into a larger Small Business Administration strategy. Prime Pacific's growth was constrained by capital and core deposits, so it represents an attractive area for further deployment of Cascade's low cost deposit base.  Subject to the satisfaction of customary closing conditions, we expect to close the acquisition in August with modest accretion to tangible book value and earnings through the second half of the year.  Importantly, we see the opportunity to build a $1 billion bank in the Seattle MSA over time.

36.    Additionally, Chip Reeves ("Reeves"), Executive Vice President and Chief Operating Officer of Cascade and President and Chief Operating Officer of Cascade Bank, commented:

We continue to experience strong momentum as our bankers delivered double digit revenue and loan growth through the second quarter.  We believe investments in talented bankers combined with the recent opening of our Seattle commercial banking center are contributing to these robust results.  Additionally, I am extremely pleased with the progress that our new Idaho region president, Rob Perez, and his team have made in a very short period of time.  Looking forward, Cascade's new business pipeline appears strong across our footprint, supporting our ambition to sustain organic loan growth above the level of our peers.

37.    On October 26, 2016, Cascade issued a press release wherein it reported its financial results for the three and nine months ended September 30, 2016.  Net interest income was $23.8 million for the third quarter, up $1.6 million, or 7.1%, from the second quarter of 2016.  At September 30, 2016, gross loans were $2.1 billion, up $158.7 million, or 8.4%, from the second quarter of 2016.  Third quarter organic loan growth was $69.7 million, or 18.0% annualized.  At September 30, 2016, total deposits were $2.7 billion, up $185.1 million, or 7.2%, from the prior-year quarter.

38.    Cascade also reported that it completed its acquisition of Pacific Financial

Services, Inc. ("PPFS") on August 1, 2016, with customer system conversion accomplished in late October. PPFS is headquartered in Lynnwood, Washington, which location complements Cascade's existing downtown Seattle commercial banking location.

39.    With respect to the financial results, Individual Defendant Zink commented:

The Cascade banking team continued to drive strong results for both our customers and our stockholders through the third quarter as we delivered double-digit loan, deposit and revenue growth[.] Our results clearly highlight the successful execution of our strategy to build Cascade into a valuable Pacific Northwest bank through both organic growth and strategic acquisitions. The Bank of America branches acquired in the first quarter continue to perform well as transaction volumes remain robust and customer satisfaction levels remain high, as evidenced by our 98.5% core deposit retention rate. We also welcomed Prime Pacific's customers, employees and stockholders to the Cascade family in August. Prime Pacific is an important component of our strategy of building a $1 billion bank in the vibrant Seattle market over the next several years. PPFS will complement our recently opened downtown Seattle commercial banking center, as well as expand our Small Business Administration lending strategy in this market.

40.    Additionally, Reeves commented:

The third quarter's strong organic loan and deposit production was evident across Cascade's footprint, reflecting not only the solid economic underpinnings of our markets but also the investments that we have made to attract talented in-market bankers. We are extremely pleased with the positive leadership and clear progress that our newly hired banking teams have demonstrated since joining the bank as they have quickly delivered healthy organic growth in our core markets led by Portland, Boise and Seattle. Looking forward, Cascade's new business pipeline remains strong, indicating we are likely to sustain organic loan growth above the level of our peer banks. Additionally, we will continue to invest in experienced bankers and teams to help expand Cascade's first-class community banking franchise in the Pacific Northwest.

41.    Nevertheless, on November 17, 2016, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

42.    To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor First Interstate and are calculated to unreasonably dissuade

potential suitors from making competing offers.

43.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 6.12(a) of the Merger Agreement states, in relevant part:

> (a) Except as expressly permitted by this Section 6.12, the Company agrees that it will not, and will cause each of its Subsidiaries and its and their respective officers, directors and employees, and will use its reasonable best efforts to cause its and their respective agents, advisors, financing sources, investment bankers, attorneys and other representatives (collectively with officers, directors and employees, "Representatives"), not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate inquiries or proposals regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal, (ii) engage or participate in any discussions or negotiations with any person concerning any Acquisition Proposal, (iii) disclose or provide any confidential or nonpublic information or data to, or otherwise cooperate in any way with, any person in connection with any Acquisition Proposal (including by affording access to the personnel, properties, books, records or assets of the Company or its Subsidiaries) or (iv) unless this Agreement has been terminated in accordance with its terms, enter into any term sheet, letter of intent, commitment, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, or other agreement (whether written or oral, binding or nonbinding) (other than a confidentiality agreement referred to and entered into in accordance with this Section 6.12(a)) relating to any Acquisition Proposal (provided, however, that the foregoing shall not prevent the Company or its Representatives from contacting any person who has made an Acquisition Proposal or inquiry or proposal relating thereto solely for the purpose of seeking clarification of the terms and conditions thereof). . . . The Company will, and will cause its Representatives to, immediately cease and cause to be terminated any activities, discussions or negotiations conducted before the date of this Agreement with any person other than Parent with respect to any Acquisition Proposal and will request pursuant to any applicable confidentiality agreements the return or destruction of any information provided to any such person in connection therewith.

44.     Further, the Company must promptly advise First Interstate of any proposals or

inquiries received from other parties. Section 6.02(a) of the Merger Agreement states, in relevant part:

> The Company will promptly (and within twenty-four (24) hours) advise Parent following receipt of any Acquisition Proposal or any inquiry which could reasonably be expected to lead to an Acquisition Proposal, and the substance thereof (including the terms and conditions of and the identity of the person making such inquiry or Acquisition Proposal) and will provide Parent an unredacted copy of such Acquisition Proposal or inquiry and any draft agreements, proposals or other materials received in connection with such inquiry or Acquisition Proposal, and will keep Parent apprised of any related material developments, discussions and negotiations on a reasonably current basis, including any amendments to or revisions of the terms of such inquiry or Acquisition Proposal (including providing an unredacted copy of such amended or revised Acquisition Proposal and any further or revised draft agreements, proposals or other materials received in connection with such inquiry or Acquisition Proposal).

45.    The Merger Agreement further requires that "[t]he Company [] use its reasonable best efforts to enforce any existing confidentiality agreements to which it or any of its Subsidiaries is a party."

46.    Moreover, Section 6.3(b) of the Merger Agreement provides:

(b) Notwithstanding the foregoing, subject to and in compliance with Section 6.12, prior to receipt of the Requisite Company Vote, in the case of the Company, or the Requisite Parent Vote, in the case of Parent, the Board of Directors of the Company or Parent, after consultation with its outside counsel and, with respect to financial matters, its financial advisor, determines in good faith that it would more likely than not result in a violation of its fiduciary duties under applicable law to continue to make the Company Board Recommendation or the Parent Board Recommendation, as the case may be, to its shareholders (and, in the event such determination is made by the Board of Directors of the Company in response to an Acquisition Proposal, the Board of Directors of the Company has taken into account the expected timing of and regulatory conditions related to such Acquisition Proposal), the Company or Parent and its respective Board of Directors, as the case may be, may submit this Agreement and the transactions contemplated hereby to its respective shareholders without recommendation or otherwise effect a Recommendation Change (although the resolutions adopting this Agreement as of the date hereof may not be rescinded or amended), in which event the Company or Parent and its respective Board of Directors, as the case may be, may communicate the basis for its Recommendation Change to its shareholders in the Joint Proxy Statement or an appropriate amendment or

supplement thereto to the extent required by law; provided, that neither party nor its Board of Directors may take any actions under this sentence unless (i) it gives the other party at least five (5) business days' prior written notice of its intention to take such action and a reasonable description of the event or circumstances giving rise to its determination to take such action (including, in the event such action is taken by the Company or its Board of Directors in response to an Acquisition Proposal, the latest material terms and conditions and the identity of the third party in any such Acquisition Proposal, or any amendment or modification thereof, including unredacted copies of any such Acquisition Proposal or other materials received in connection with or correspondence relating to, such Acquisition Proposal, or any amendment or modification thereof, (ii) during such notice period the Company or Parent and its Board of Directors, as the case may be, and its Representatives negotiate in good faith with the other party and its Representatives any amendment or modification to this Agreement proposed by such other party and (iii) at the end of such notice period, the Board of Directors takes into account any amendment or modification to this Agreement proposed in writing by the other party prior to the expiration of such notice period, and after receiving the advice of its outside counsel and, with respect to financial matters, its financial advisors, determines in good faith that it would nevertheless continue to be more likely than not to result in a violation of its fiduciary duties under applicable law to continue to make the Company Board Recommendation or Parent Board Recommendation, as the case may be. Any change to the financial or other material terms of any Acquisition Proposal, or any material change to the event or circumstances giving rise to the applicable Board of Directors' determination to effect a Recommendation Change during a notice period, will be deemed to be a new Acquisition Proposal or a new such event or circumstance, as applicable, for purposes of this Section 6.3 and will require a new notice period as referred to in this Section 6.3, except that the notice period shall be three (3) business days.

47.    Further locking up control of the Company in favor of First Interstate, the Merger Agreement provides for a "termination fee" of $22,097,579.00, payable by the Company to First Interstate if the Individual Defendants cause the Company to terminate the Merger Agreement.

48.    By agreeing to the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

49.    Additionally, the Individual Defendants and certain stockholders of the Company entered into voting agreements, pursuant to which they will vote their Company shares in favor

of the merger. Accordingly, such shares are already locked up in favor of the Proposed Transaction.

50. The consideration to be provided to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

51. The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

52. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

53. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

54. For example, two of the Individual Defendants will serve on the First Interstate board of directors following the consummation of the Proposed Transaction.

55. Further, Reeves, Executive Vice President and Chief Operating Officer of Cascade and President and Chief Operating Officer of Cascade Bank, will apparently also serve as Chief Banking Officer—West of First Interstate Bank, following the close of the merger.

56. Additionally, Individual Defendant Zink stands to receive $6,877,552 in connection with the Proposed Transaction. Reeves stands to receive $2,822,064, and the Company's three other named executive officers stand to receive $6,803,852.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

57. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

58.    The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

59.    First, the Registration Statement omits material information regarding Cascade's financial projections, the financial analyses performed by Cascade's financial advisor, Piper Jaffray & Co. ("Piper Jaffray"), First Interstate's financial projections, and the financial analyses performed by First Interstate's financial advisor, Barclays Capital Inc. ("Barclays").

60.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

61.    With respect to Cascade's financial projections, the Registration Statement fails to disclose Cascade's projected dividends, as well as all other projection line items for the Company, including, but not limited to, free cash flow; book value; tangible book value; return on average assets; return on average tangible equity; tangible common equity/tangible assets; leverage ratio; tier 1 and total capital ratio; non-interest bearing deposits and deposits; non-performing assets/loans and assets/loans; loan loss reserve and gross loans; other real estate owned; last twelve months net charge-offs and average loans; last twelve months fee income and revenue ratio; and net interest margin.

62.    With respect to Piper Jaffray's *Discounted Cash Flow Analysis* for Cascade, the Registration Statement fails to disclose:  (i) the terminal value of Cascade common stock at

December 31, 2022; (ii) the estimated earnings growth rate for years 2021 and 2022 and resulting projections for those years; (iii) Piper Jaffray's basis for applying price to earnings multiples of 11.0x to 15.0x and discount rates ranging from 9.0% to 13.0%; and (iv) the metric to which Piper Jaffray applied multiples to derive the terminal value for the Company.

63.    With respect to Piper Jaffray's *Discounted Cash Flow Analysis* for First Interstate, the Registration Statement fails to disclose:  (i) the terminal value of First Interstate Class A common stock at December 31, 2022; (ii) the consensus mean analyst earnings estimates through December 31, 2020; (iii) the mean consensus estimate growth rate for 2021 and 2022 and resulting projections; and (iv) Piper Jaffray's basis for applying price to earnings multiples of 11.0x to 16.0x and discount rates ranging from 9.0% to 13.0%.

64.    With respect to Piper Jaffray's *Selected Companies Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the companies observed by Piper Jaffray in its analysis.

65.    With respect to Piper Jaffray's *Comparable Transaction Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Piper Jaffray in its analysis.

66.    With respect to Piper Jaffray's *Financial Impact Analysis*, the Registration Statement fails to disclose the assumptions relating to the synergies used in the analyses, as well as the dilution/accretion results of the analysis.

67.    Additionally, the Registration Statement fails to disclose First Interstate's financial projections, which are particularly material here, as a percentage of the merger consideration is First Interstate stock.  Among other things, the Registration Statement fails to disclose projected dividends; free cash flow; book value; tangible book value; return on average

assets; return on average tangible equity; tangible common equity/tangible assets; leverage ratio; tier 1 and total capital ratio; non-interest bearing deposits and deposits; non-performing assets/loans and assets/loans; loan loss reserve and gross loans; other real estate owned; last twelve months net charge-offs and average loans; last twelve months fee income and revenue ratio; and net interest margin.

68.    Similarly, the Registration Statement omits material information regarding the financial analyses performed by First Interstate's financial advisor, Barclays.

69.    With respect to Barclays' *Dividend Discount Analysis* for First Interstate, the Registration Statement fails to disclose:  (i) the projected dividends on shares of First Interstate Class A common stock through December 31, 2021; and (ii) the terminal value of First Interstate as of December 31, 2021.

70.    With respect to Barclays' *Dividend Discount Analysis* for Cascade, the Registration Statement fails to disclose:  (i) the projected dividends on shares of Cascade common stock through December 31, 2021; and (ii) the terminal value of Cascade as of December 31, 2021.

71.    With respect to Barclays' *Selected Comparable Company Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the companies observed by Barclays in its analysis.

72.    With respect to Barclays' *Selected Precedent Transaction Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Barclays in its analysis.

73.    The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i)

"Background of and Cascade's Reasons for the Merger"; (ii) "Recommendation of Cascade's Board of Directors"; (iii) "Opinion of Cascade's Financial Advisor"; and (iv) "Unaudited Prospective Financial Information."

74.    Second, the Registration Statement omits material information regarding Piper Jaffray's potential conflicts of interest.

75.    Specifically, the Registration Statement fails to disclose the past services Piper Jaffray has provided to First Interstate and its affiliates, as well as the amount of compensation Piper Jaffray received for such services.

76.    Additionally, the Registration Statement fails to disclose the amount of compensation Piper Jaffray has received from Cascade for the previous services it provided to Cascade.

77.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

78.    The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i) "Background of and Cascade's Reasons for the Merger"; (ii) "Recommendation of Cascade's Board of Directors"; and (iii) "Opinion of Cascade's Financial Advisor."

79.    Third, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

80.    Specifically, the Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of the Company's officers and directors, including who participated in all such communications.

81.    For example, the Registration Statement states that, "during the merger negotiations, First Interstate informed Cascade that it is interested in retaining Mr. Reeves, Executive Vice President and Chief Operating Officer of Cascade and President and Chief Operating Officer of Cascade Bank, and employing him as Chief Banking Officer—West of First Interstate Bank."  However, the Registration Statement fails to disclose the timing and nature of such discussions, as well as who participated in such discussions.

82.    Moreover, the Registration Statement states that "two members of Cascade's board of directors will be appointed to First Interstate's board of directors."  However, the Registration Statement fails to disclose the timing and nature of discussions regarding the First Interstate board positions, including who participated in such discussions, as well as which Individual Defendants will serve on the First Interstate board.

83.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

84.    The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of and Cascade's Reasons for the Merger"; (ii) "Recommendation of Cascade's Board of Directors"; and (iii) "Interests of Cascade's Directors and Executive Officers in the Merger."

85.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Cascade**

86.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

87.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Cascade is liable as the issuer of these statements.

88.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

89.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

90.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

91.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

92.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

93.    Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and First Interstate

94.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

95.    The Individual Defendants and First Interstate acted as controlling persons of Cascade within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Cascade and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

96.    Each of the Individual Defendants and First Interstate was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

97.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Registration Statement.

98.    First Interstate also had direct supervisory control over the composition of the

Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

99.      By virtue of the foregoing, the Individual Defendants and First Interstate violated Section 20(a) of the 1934 Act.

100.      As set forth above, the Individual Defendants and First Interstate had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 13, 2017

**RANSOM, GILBERTSON, MARTIN
& RATLIFF, L.L.P**

By:  */s/ Jeffrey Ratliff*
_____

**OF COUNSEL:**

Jeffrey Ratliff
8401 NE Halsey Street, Suite 208
Portland, Oregon 97220

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

*Attorneys for Plaintiff*

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800